```
UNITED STATES DISTRICT COURT                              C/M
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------  X
KERRY RITA CONSTANTINO,                                  :
                                                         :  **MEMORANDUM**
                              Plaintiff,                 :  **DECISION AND ORDER**
                                                         :
         - against -                                     :  18-cv-5730 (BMC) (LB)
                                                         :
CHRISTOPHER DISTEFANO,                                   :
                                                         :
                              Defendant.                 :
----------------------------------------------------------  X
```

**COGAN**, District Judge.

Plaintiff *pro se* brings this excessive force action under 42 U.S.C. § 1983 alleging that she suffered an injury when defendant, a police officer, stepped on her left big toe. She also claims that the police officer deprived her of her bipolar medication. The police officer has moved for summary judgment. There are factual issues as to whether the force used for the toe-stepping was excessive, sufficient to preclude summary judgment on the merits or on qualified immunity grounds. However, there is no basis for her claim that the police deprived her of her bipolar medication, and I therefore grant summary judgment dismissing that claim.

## BACKGROUND

This case does not present a dog-bites-man story, but rather a woman-bites-man story, although there is a dog involved. The following facts are undisputed, except as noted.

The dog at issue belonged to plaintiff's roommate. The dog apparently engaged in some undescribed behavior that was unacceptable to plaintiff, and plaintiff became engaged in a dispute with her roommate over his dog's behavior. Her roommate called the police, reporting that plaintiff had bitten his hand and punched him in the face. Plaintiff confirmed at her

deposition that she bit her roommate in the finger, and that, in fact, she "tried to bite it off, but I couldn't get it off." She later pled guilty to assault.

Upon being transported to the precinct and placed in a holding cell, plaintiff acknowledges that she caused a disturbance. She was "shaking the gate," picking up the bench in the cell and slamming it down, yelling at officers, complaining of claustrophobia, and demanding her medication (Seroquel) for her bipolar condition. The police called an ambulance, and she was handcuffed, removed from her cell, and placed in a chair near the desk sergeant to await the arrival of the ambulance. The desk sergeant advised plaintiff that an ambulance was on its way to take her to the hospital for her medication.

According to plaintiff's sworn testimony taken pursuant to N.Y. Gen. Mun. L. §50-h, Officer DiStefano, at that point, came over to her and stepped on her toe. Plaintiff almost started crying from the pain – she asserts in this action that it became "really, really swollen" – and she asked DiStefano why he had done that. He said it was because he was going to shackle her ankles and wanted to make sure she didn't kick him in the face, as that would mean more charges against her.

However, at her deposition in this case, plaintiff testified to a version of the events that differed from her § 50-h testimony in one significant way. She testified that Officer DiStefano stepped on her toe (this time, she testified "stomped" on it) *after* he had applied the shackles, not before. She also did not relate any conversation with him as to his reason for stepping on her toe.

In any event, shortly after Officer DiStefano had shackled her ankles, EMS workers arrived. Trailed by Officer DiStefano in a patrol car, they took her by ambulance to Richmond University Medical Center on Staten Island ("RUMC"). At RUMC, plaintiff had her toe x-

2

rayed. The doctor who reviewed the x-ray told her that nothing was wrong with it. In addition, the hospital records indicate that upon admission, plaintiff "report[ed] that she injured her left toe when she was kicked to her foot by another inmate," and that she complained of "left great toe pain and requested her daily dose of Seroquel." Furthermore, the records of the examination show only self-reported tenderness, and the x-ray showed no fracture or dislocation. Finally, plaintiff testified that Officer DiStefano "prevented" her from getting Seroquel at the hospital by telling her he would talk to the doctors for her and then, she assumes, telling the doctors she didn't need any medication. In any event, she did not receive the Seroquel.

Plaintiff was later taken to Rikers Island where the medical staff examined her toe again. The record made by the examining physician shows toe pain, minimal swelling, no gross deformity, and intact skin. She was given Ibuprofen, and another x-ray confirmed no fractures, mild degenerative disease, and, perhaps most significantly, a bunion.

Upon her release a week later, plaintiff went to Staten Island University Hospital (SIUH) and received another examination and x-ray on her toe. According to the medical records, she had tenderness in her toes (plural), but no obvious deformity, swelling, or skin disruption. The x-ray again showed no fractures or dislocation but confirmed the bunion. About a week later, plaintiff came back to SIUH for an ultrasound of her toe, which showed *hallus valgus*. That is a bunion caused by a dislocation or migration of the metatarsal bone of the big toe moving towards the second toe.

There is no record of plaintiff getting any treatment until about three months later, when she had an MRI on her toe. By that time, the record from her appointment shows that her *hallus valgus* was "severe," and she had a stress fracture in her big toe and several other problems with her foot (some or all of which could have been caused by her trying to walk differently to

compensate for the painful bunion). She ultimately had surgery to remove the bunion and has been better since then.

## DISCUSSION

### I.

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material when it might affect the outcome of the suit under governing law." Tracy v. Freshwater, 623 F.3d 90, 95 (2d Cir. 2010) (quoting McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007)). It is an "axiom . . . in ruling on a motion for summary judgment [that] '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

Ultimately, summary judgment should be granted "only if, taking all of plaintiff['s] evidence as true, [a court] find[s] that no reasonable juror could conclude that plaintiff[] ha[s] established that the . . . police violated plaintiff['s] constitutional rights under circumstances subjecting the [defendants] to liability under § 1983." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122-23 (2d Cir. 2004). In conducting this analysis, I am mindful that "[a] document filed *pro se* is to be liberally construed." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal quotation marks and citation omitted).

### II.

To establish that "the use of force to effect an arrest was unreasonable and therefore a violation of the Fourth Amendment, [a plaintiff] must establish that the government interests at

stake were outweighed by 'the nature and quality of the intrusion on [the plaintiff's] Fourth Amendment interests.'" Amnesty Am., 361 F.3d at 123 (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). "[T]he factfinder must determine whether, in light of the totality of the circumstances faced by the arresting officer, the amount of force used was objectively reasonable at the time." Id. (citing Graham, 490 U.S. at 397). This analysis "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (quoting Graham, 490 U.S. at 396). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Tracy, 623 F.3d at 96 (quoting Graham, 490 U.S. at 397). Importantly, "[g]iven the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." Amnesty Am., 361 F.3d at 123 (citing O'Bert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003)). The Supreme Court has set forth several non-exclusive factors in determining whether an excessive force claim should go to the jury: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396 (1989).

Before applying those principles to the circumstances of the case, I need to address the fact that plaintiff has given two different versions of the event. The version in her § 50-h examination – that Officer DiStefano stepped on her foot before shackling her and told her he was doing that to stop her from kicking him – arguably leans more towards objective reasonableness than her version in her deposition – that he stomped on her foot after he had

5

shackled her – which would have been gratuitous. However, notwithstanding the general rule that the facts must be viewed in the light most favorable to plaintiff on a motion for summary judgment, see Burns v. Martuscello, 890 F.3d 77, 83 (2d Cir. 2018), she cannot raise an issue of fact by pointing to her own conflicting sworn statements. Cf. Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 482 (2d Cir. 2014) (plaintiff cannot defeat summary judgment by introducing affidavit that contradicts her deposition testimony); In re Fosamax Prods. Liab. Litig., 707 F.3d 189, 194 (2d Cir. 2013) (holding a district court, when deciding a summary judgment motion, may disregard a witness's deposition testimony when it "inescapably and unequivocally contradicted the testimony he gave [on an earlier date]"). Plaintiff has not proffered a plausible explanation that would allow a reasonable jury to reconcile the inconsistencies between her earlier § 50-h testimony and subsequent her deposition. See Jeffreys v. City of New York, 426 F.3d 549, 555 n.2 (2d Cir. 2005).

However, even holding plaintiff to her earliest testimony, I do not see the circumstances of this case in the same way as defendant. First, it must be assumed for purposes of this motion that Officer DiStefano placed his foot on top of plaintiff's foot with an undetermined degree of pressure to deter her from kicking him while he shackled her. That seems to me a suspicious way to achieve that goal, arguably not within usual police techniques. If she was still creating a disturbance (see next paragraph), an officer or two could have held her legs down to the chair without as much risk of injury as the officer putting his weight on her foot.

Second, and perhaps more importantly, there is no evidence before me that she was still struggling when she was sitting in the chair by the sergeant's desk. It is true, looking at the first Graham factor, that she was being held for a serious crime (an assault) and perhaps even more importantly, creating a somewhat violent disturbance in her cell – for that reason, I do not

6

begrudge the police for making the decision to shackle her before taking her to the hospital. But the disturbance in the cell was at least in part because she wanted her medication. Once it was agreed that she was going to go the hospital to get it (as the precinct is obviously not a pharmacy or medical office), the record contains no indication that she continued to carry on.

To the contrary, plaintiff testified in her deposition – and this was not inconsistent with her § 50-h examination – that her demeanor while Officer DiStefano was putting the shackles on her legs was as follows: "I was normal. I was normal, just ready to go to the hospital to get medicated." Considering that she readily admits causing a disturbance in a cell, a jury could choose to credit her statement. The fact that she was in a chair, handcuffed, but not restrained to the chair and yet not jumping out of it, also tends to confirm that she had quieted down. I certainly have no evidence that Officer DiStefano had to make a "split second" decision to stomp on her foot because she was trying to kick him.

Defendant makes much of what he describes as the minimal nature of plaintiff's injury; I am not convinced of that either. The most reasonable inference from the record is that plaintiff had a pre-existing *hallus valgus* – as defendant points out, she was diagnosed with a bunion two years before this incident (despite her testimony to the contrary) – that, depending in part on whether one accept defendant's characterization that he "placed his foot on" plaintiff's or her characterization that he "stepped on" or "stomped on" her foot, may have been aggravated by the encounter. Following the incident, her medical condition deteriorated as these things sometimes do.

There are, therefore, at least several factual issues as to whether Officer DiStefano used excessive force. First, the alleged "stomp" on plaintiff's foot, if it was a stomp, on a bunion, if it was sufficiently advanced, could certainly cause extreme pain. Second, the extent, if any, to

7

which plaintiff's *hallus valgus* was made worse because of the contact presents a factual issue. It does not help to point to the apparent lack of serious injury immediately following the incident, as defendant attempts, because that does not resolve the issue of whether the "stomp" (viewing the facts most favorably to plaintiff), set in motion a greater degeneration of her condition than would have otherwise occurred. Nor does it matter that plaintiff had a preexisting bunion problem because under the eggshell skull doctrine, Officer DiStefano was required to "take[] the plaintiff as he finds [her]." Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 908 (2d Cir. 1993) (citation omitted).

In sum, the combination of the unorthodox restraining technique and the uncertainties surrounding its effect on plaintiff constitute factual issues that preclude summary judgment. Whether plaintiff is going to be able to prove at trial that the incident occurred the way she said it did or, perhaps more problematically, whether it caused or contributed to the damage that she claims to have suffered, cannot be resolved on this motion.

### III.

For similar reasons, I cannot find qualified immunity. A stomp is different than a "placement" of Officer DiStefano's foot on plaintiff's foot, and it is hard to see qualified immunity applying if it was the former unless, perhaps, if she was in the act of trying to kick him (as to which I have no evidence). Moreover, one possible, although probably not most likely, inference from the facts is that Officer DiStefano stomped on plaintiff's foot to stun her while he applied the shackles or even, without having anything to do with the shackles, punish her for her earlier misconduct. If this was a gratuitous stomp, qualified immunity seems unlikely. Interrogatories to the jury will answer these questions and enable a decision on qualified immunity with more precision than I can make on this motion.

8

# IV.

On the accusation that Officer DiStefano deprived her of her Seroquel, however, no reasonable jury could find in plaintiff's favor. Plaintiff merely speculates that Officer DiStefano told hospital personnel not to give it to her because she in fact did not get it. But she did not hear any such conversation. To the contrary, she told both the EMS personnel and the nurse she saw at the hospital, at least, that she wanted Seroquel (the nurse gave her Tylenol). I do not see how a police officer could have the authority or practical ability to supersede the determination of hospital personnel as to what medications she should have.

Pre-trial detainees, including persons who have not been formally arrested, have a due process right under the Fifth Amendment which protects them from an officer's deliberate indifference to their medical needs while in custody. To successfully plead a deliberate interference claim, plaintiff must show that, while in an officers' custody, she had a "serious medical condition" which was met with "deliberate indifference." "Deliberate indifference" means that the "official knows of and disregards an excessive risk to inmate health or safety[.]" Cuoco v. Moritsugu, 222 F.3d 99, 107 (2d Cir. 2000) (internal quotation marks and citation omitted).

Plaintiff's speculation arises from two things that Officer DiStefano told her. First, when she first arrived at the hospital, he told her to "go back in the room and I'll do all the talking," presumably with the hospital personnel. That is when she assumes he told hospital personnel not to medicate her. Second, as she was preparing to leave the hospital and it was clear that she was not going to be given Seroquel, she asked Officer DiStefano why and he said, "because I have to get home." Those two comments are insufficient for a reasonable jury to find that Officer

DiStefano was somehow able to insert himself into the decisional chain of the hospital to determine to withhold medication for plaintiff.

Finally, any injury to plaintiff from the missing of one dose of Seroquel is not a sufficient injury to rise to the level of a constitutional violation. Plaintiff testified that she had missed doses in the past, and that all that happens is that she gets irritable. Both the Second Circuit and numerous district courts within it have found that missing a single dose or even several doses of medicine is generally not actionable, even where the effect of missing a single dose is far more severe than plaintiff claims to have experienced here. See Smith v. Carpenter, 316 F.3d 178, 188–89 (2d Cir. 2003) (finding no constitutional violation because of two alleged episodes of missed HIV medication where the plaintiff failed to present evidence of permanent or on-going harm or an unreasonable risk of future harm stemming from missed doses); Ferguson v. Cai, No. 11-cv-6181, 2012 WL 2865474, at *4 (S.D.N.Y. Jul 12, 2012) (missing single dose of insulin that caused temporary blindness, pain, and leg swelling not actionable); Youngblood v. Artus, No. 10-cv-752, 2011 WL 6337774, at *7 (N.D.N.Y. Dec. 19, 2011) (granting motion to dismiss deliberate indifference claim where the defendant "failed to give [the plaintiff] a single dose of his seizure medication" and the plaintiff did not specify resulting harm caused); Barclay v. State of New York, No. 02-cv-717, 2009 WL 799972 (N.D.N.Y. March 25, 2009) (inability to take single dose of medication not a constitutional violation); Bumpus v. Canfield, 495 F. Supp. 2d 316, 322 (W.D.N.Y. 2007) (dismissing deliberate indifference claim based on "a delay of several days in dispensing plaintiff's hypertension medication" absent evidence "the delay gave rise to a significant risk of serious harm"); Davidson v. Bartholome, 460 F. Supp. 2d 436, 446-48 (S.D.N.Y. 2006) (retaliatory refusal of nurse to administer single dose of medicine not a constitutional violation); Evans v. Bonner, 196 F. Supp. 2d 252, 256 (E.D.N.Y. 2002) (granting

summary judgment for defendant on claim that medication was not timely distributed because "the alleged injury to the plaintiff resulting from not getting his medicine 'on time' does not rise to a 'sufficiently serious' level").

## CONCLUSION

Defendant's motion for summary judgment [31] is granted in part and denied in part as set forth above. The case is returned to Magistrate Judge Bloom for final pretrial preparation after which the case will be set down for trial.

**SO ORDERED.**

                                                                                                                U.S.D.J.

Dated: Brooklyn, New York
       January 19, 2020